# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| JEFF HURST, derivatively on behalf of THE SCOTTS MIRACLE-GRO COMPANY<br><br>Plaintiff,<br><br>v.<br><br>EDITH AVILÉS, DAVID EVANS, BRIAN FINN, MATTHEW GARTH, CHRISTOPHER HAGEDORN, JAMES HAGEDORN, ADAM HANFT, STEPHEN JOHNSON, THOMAS N. KELLY, JR., KATHERINE HAGEDORN LITTLEFIELD, CORY MILLER, NANCY MISTRETTA, BRIAN SANDOVAL, PETER SHUMLIN, JOHN VINES, and GERALD VOLAS,<br><br>Defendants,<br><br>and<br><br>THE SCOTTS MIRACLE-GRO COMPANY,<br><br>Nominal Defendant. | Case No.: 2:24-cv-4190 |

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## Demand for Jury Trial

## INTRODUCTION

Plaintiff Jeff Hurst ("Plaintiff"), by and through his counsel, derivatively on behalf of Nominal Defendant The Scotts Miracle-Gro Company ("ScottsMiracle" or the "Company"), submits this Verified Stockholder Derivative Complaint against Defendants and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which included, *inter alia*, review and analysis of (i) regulatory filings made by ScottsMiracle with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by ScottsMiracle; (iii) court submissions in securities class actions against certain officers and members of the Company's Board of Directors (the "Board") alleging issuance of false and misleading statements of material fact and the omission of material facts necessary to make other statements made not misleading, between June 2, 2021 and August 1, 2023 (the "Relevant Period") with respect to ScottsMiracle's business, operations, and prospects; and (iv) other publicly available information concerning ScottsMiracle.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserted on behalf of Nominal Defendant ScottsMiracle against certain officers and the members of the Company's Board for the claims asserted herein to recover damages caused to the Company.

2.      ScottsMiracle, based in Marysville, Ohio, is a leading producer and marketer of consumer lawn, garden, and agricultural products.  The Company operates through three reportable segments: U.S. Consumer, Hawthorne, and Other.  ScottsMiracle is also the exclusive agent for The Monsanto Company's consumer Roundup® products.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

3.     At the heart of this scheme was the Company's precarious debt situation. ScottsMiracle operated under senior secured credit facilities that required the Company to maintain specific financial ratios, including a debt-to-earnings before interest, taxes, depreciation, and amortization ("EBITDA") ratio of less than 6.25.  Failure to meet these covenants could trigger a default, allowing lenders to declare all outstanding indebtedness immediately due and payable.

4.     To avoid breaching these covenants, the Individual Defendants (defined herein) caused ScottsMiracle to engage in a series of deceptive practices:

    a.     They flooded the market with excess inventory, pressuring retailers to purchase more products than needed or wanted;

    b.     They misrepresented the Company's inventory levels and sales performance, claiming strong demand and "record shipments" when in reality, ScottsMiracle was struggling with inventory saturation;

    c.     They falsely assured investors that the Company was "comfortably within" its debt covenant requirements when, in fact, ScottsMiracle was dangerously close to breaching these covenants;

    d.     They improperly changed how the Company calculated EBITDA in the fourth quarter of the 2022 fiscal year to remain compliant with debt covenants; and

    e.     They failed to maintain adequate internal controls over financial reporting.

5.     As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

6.     The truth began to emerge on June 8, 2022, when ScottsMiracle disclosed that refill orders from U.S. retailers were more than $300 million below target, forcing the Company to slash

its 2022 full-year earnings guidance in half. This revelation caused the Company's stock price to fall by approximately 9%.

7.     The full extent of the Company's problems was revealed on August 2, 2023, when ScottsMiracle announced its financial results for the third quarter of 2023. The Company disclosed that it had amended its debt covenants to permit a higher debt-to-EBITDA ratio, that sales had fallen by 6%, gross margins had decreased by 420 basis points, and that the Company had to write down $20 million for "pandemic driven excess inventories." This news caused ScottsMiracle's stock price to plummet by approximately 19%.

8.     As a direct and proximate result of the misconduct described herein by Individual Defendants (defined herein), ScottsMiracle has sustained significant damages as explained below.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20D of the Securities Exchange Act ("Exchange Act") and SEC Rule 10b-5 promulgated thereunder, as well as Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder. The Court has supplemental jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims form part of the same case or controversy. This action is not a collusive one designed to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     This Court has jurisdiction over each Defendant because they reside in this District or have sufficient minimum contacts with this District to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice. The Court has personal jurisdiction over the Nominal Defendant because it is authorized to do business in Ohio.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary

participation in the wrongful acts detailed herein and violation of fiduciary duties owed to ScottsMiracle. Venue is also proper pursuant to 28 U.S.C. § 1401 because Nominal Defendant ScottsMiracle could have sued the same Defendants in this District.

## PARTIES

12.     Plaintiff is a ScottsMiracle stockholder and has continuously held ScottsMiracle stock from the time of the wrongdoing alleged herein until the present. Plaintiff will fairly and adequately represent ScottsMiracle's interest in this action.

13.     Nominal Defendant ScottsMiracle is incorporated under the laws of Ohio, and its principal executive offices are located at 14111 Scottslawn Road, Marysville, Ohio. ScottsMiracle's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "SMG."

14.     Defendant Edith Avilés ("Avilés") has served as a member of the Board since 2023. She also has served as a member of the Audit Committee and Finance Committee since January 2023.

15.     Defendant David Evans ("Evans") has served as a member of the Board since 2018 and has been a member of its Audit Committee since 2018, sitting as Chair since 2023. He also has served as a member of the Finance Committee since January 2020. Defendants Evans also served as ScottMiracle's Executive Vice President & Interim Chief Financial Officer ("CFO") of the Company from August 2022 until November 2022. Defendant Evans also served in various managerial roles at the Company, including, most recently, CFO and Executive Vice President, Strategy and Business Development from September 2006 until February 2013. During the Relevant Period, Defendant Evans sold 4,659 shares of Company stock for proceeds of over $298,000 as shown by the following chart:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/29/2022 | 1,659 | $ 53.69 | $ 89,066.57 |
| 3/31/2023 | 3,000 | $ 69.74 | $ 209,220.00 |
| **Total** | **4,659** | | **$ 298,286.57** |

16.     Defendant Brian Finn ("Finn") served as a member of the Board from 2014 to January 23, 2023.  He also served as a member of the Finance Committee from at least January 2019 to January 2023.

17.     Defendant Matthew Garth ("Garth") has served as Executive Vice President and CFO of the Company since December 2022.

18.     Defendant Christopher Hagedorn ("C. Hagedorn") has served as Division President of the Company since January 2021.  During the Relevant Period, Defendant C. Hagedorn sold 28,106 shares of Company stock for proceeds of almost $4 million as shown by the following chart:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 10/26/2021 | 20,105 | $ 149.58 | $ 3,007,305.90 |
| 2/4/2022 | 5,745 | $ 132.87 | $ 763,338.15 |
| 2/3/2023 | 2,256 | $ 82.27 | $ 185,601.12 |
| **Total** | **28,106** | | **$ 3,956,245.17** |

19.     Defendant James Hagedorn ("J. Hagedorn") has served as Chief Executive Officer ("CEO") of the Company since May 2001, Chairman of the Board since January 2003, and President since October 2023 as well as from October 2015 until February 2016.  He has served as a member of the Board since 1995 and has been with the Company since 1987.  During the Relevant Period, Defendant J. Hagedorn sold 348,483 shares of Company stock for proceeds of over $42 million as shown by the following chart:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 1/31/2022 | 191,153 | $ 151.20 | $ 28,902,333.60 |
| 2/4/2022 | 14,628 | $ 132.87 | $ 1,943,622.36 |
| 5/13/2022 | 22,251 | $ 96.84 | $ 2,154,851.37 |
| 5/13/2022 | 10,138 | $ 97.53 | $ 988,779.42 |
| 5/13/2022 | 27,611 | $ 98.53 | $ 2,720,589.14 |
| 1/17/2023 | 18,923 | $ 60.25 | $ 1,140,097.50 |
| 1/17/2023 | 31,077 | $ 61.09 | $ 1,898,465.96 |
| 2/3/2023 | 7,702 | $ 82.27 | $ 633,643.54 |
| 5/12/2023 | 10,162 | $ 66.46 | $ 675,399.04 |
| 5/12/2023 | 14,838 | $ 67.36 | $ 999,509.94 |
| **Total** | **348,483** | | **$ 42,057,291.86** |

20.    Defendant Adam Hanft ("Hanft") has served as a member of the Board since 2010 and has been a member of the Finance Committee since 2023.

21.    Defendant Stephen Johnson ("Johnson") has served as a member of the Board since 2010.  During the Relevant Period, Defendant Johnson sold 6,800 shares of Company stock for proceeds of almost $538,000 as shown by the following chart:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 5/4/2022 | 2,000 | $ 113.26 | $ 226,526.20 |
| 5/4/2022 | 305 | $ 113.98 | $ 34,763.90 |
| 11/18/2022 | 3,560 | $ 56.47 | $ 201,042.81 |
| 2/7/2023 | 935 | $ 80.48 | $ 75,246.09 |
| **Total** | **6,800** | | **$ 537,579.00** |

22.    Defendant Thomas N. Kelly, Jr. ("Kelly") has served as a member of the Board since 2006.  Defendant Kelly served as a member of the Audit Committee from 2014 to at least December 2022.  He also has served as a member of the Finance Committee since 2022.

23.    Defendant Katherine Hagedorn Littlefield ("Littlefield") has served as a member of the Board since 2000 and has served as Chair of the Finance Committee since at least December 2018.

24.     Defendant Cory Miller ("Miller") served as Executive Vice President and CFO from August 2021 to August 29, 2022.  During the Relevant Period, Defendant Miller sold 3,695 shares of Company stock for proceeds of over $519,000 as shown by the following chart

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 10/26/2021 | 1,687 | $ 149.58 | $ 252,341.46 |
| 2/4/2022 | 2,008 | $ 132.87 | $ 266,802.96 |
| **Total** | **3,695** | | **$ 519,144.42** |

25.     Defendant Nancy Mistretta ("Mistretta") served as a member of the Board from 2007 until her retirement in January 2024.  She served as Chair of the Audit Committee from 2014 to at least December 2022 and as a member of the Finance Committee from at least 2019 to 2022.

26.     Defendant Brian Sandoval ("Sandoval") has served as a member of the Board since 2022.

27.     Defendant Peter Shumlin ("Shumlin") has served as a member of the Board since 2017.  He served as a member of the Finance Committee from 2020 until at least 2022.   On November 11, 2022, Defendant Shumlin sold 750 shares of Company stock for proceeds of almost $43,000 as shown by the following chart:

| Date of Transaction | Number of Shares Sold | Price | Proceeds |
|---|---|---|---|
| 11/18/2022 | 750 | $ 56.94 | $ 42,705.00 |

28.     Defendant John Vines ("Vines") has served as a member of the Board since 2013.

29.     Defendant Gerald Volas ("Volas") served as a member of the Board from 2021 to July 11, 2023.  He also served as a member of the Audit Committee and the Finance Committee during that time.

30.     Relevant Non-Party Mark Kingdon ("Kingdon") has served as a member of the Board since 2023.  He has served as a member of the Audit Committee and the Finance Committee since July 2023.

31.     The following Defendants are herein referred to as the "Individual Defendants": Avilés, Evans, Finn, Garth, C. Hagedorn, J. Hagedorn, Hanft, Johnson, Kelly, Littlefield, Miller, Mistretta, Sandoval, Shumlin, Vines, and Volas.

32.     The following Individual Defendants are collectively referenced herein as the "Director Defendants": Avilés, Evans, J. Hagedorn, Hanft, Johnson, Kelly, Littlefield, Sandoval, Shumlin, and Vines.

33.     The following Individual Defendants are collectively referenced herein as the "Insider Trading Defendants": Evans, C. Hagedorn, J. Hagedorn, Johnson, Miller, and Shumlin.

34.     The following Individual Defendants are collectively referenced herein as the "Audit Committee Defendants": Avilés, Evans, Kelly, Mistretta, and Volas.

35.     The following Individual Defendants are collectively referenced herein as the "Finance Committee Defendants": Avilés, Evans, Hanft, Kelly, and Littlefield.

36.     The following Individual Defendants are collectively referenced herein as the "Securities Class Action Defendants": Evans, Garth, C. Hagedorn, J. Hagedorn, and Miller.

37.     The Individual Defendants and Nominal Defendant are collectively referenced herein as "Defendants."

### THE INDIVIDUAL DEFENDANTS OWE FIDUCIARY DUTIES TO THE COMPANY AND ITS STOCKHOLDERS

38.     At all times relevant to this case, the conduct of the Individual Defendants was governed by well-recognized rules to protect the Company and its stockholders, the members of the public who had invested in ScottsMiracle.

39.     Because of their positions as officers and/or directors of the Company and their ability to control its business and corporate affairs, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, loyalty, and candor and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

40.     The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders to benefit all stockholders equally and not in furtherance of their personal interest or benefit.

41.     Each of the Company's directors owes to the Company and its stockholders fiduciary duties of care and loyalty, including good faith, oversight, and candor, to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.

42.     Because of their positions of control and authority as directors and/or officers of the Company, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts alleged herein.

43.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of ScottsMiracle were required to do the following:

- Ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

- Conduct the affairs of the Company in a lawful, efficient, and business-like manner to make it possible for the Company to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- Properly and accurately inform investors and analysts as to the true financial condition of the Company at any given time, make accurate statements about the Company's financial results and prospects, and ensure that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

- Remain informed as to how the Company conducted its operations, and, upon notice of imprudent or unsound conditions or practices, make reasonable inquiry into the nature and cause of such conditions and practices, correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws; and

- Ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

44.     The Individual Defendants knowingly violated their obligations as directors and officers of the Company, acting without good faith and consciously disregarding their duties to the Company and its stockholders despite their knowledge of the risk of serious injury to the Company.

45.     Because of their positions of control and authority, the Individual Defendants were able to exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by ScottsMiracle.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

46.     The ScottsMiracle Board of Directors has adopted ScottsMiracle's Code of Business Conduct and Ethics ("Code of Conduct") to deter wrongdoing, which imposes additional duties and responsibilities on the Individual Defendants.  According to the Code of Conduct, as "guiding principles that have made [ScottsMiracle] successful" are that they "stand for [its] shareholders by striving to enhance the value of their investment" and "for an ethical, competitive marketplace."

47.     Under a section entitled WHAT IS EXPECTED OF LEADERS, the Code of Conduct provides as follows:

> Leaders at our Company have a special responsibility to demonstrate our values through their actions.  They should hold themselves to the highest standards of ethical conduct and foster an environment of integrity, honesty and respect.  They should encourage others to act with integrity to avoid even the appearance of a violation of our guiding principles.  Leaders must never retaliate against anyone for raising an ethics issue, assisting in an investigation, or participating in any proceeding relating to an alleged violation of this Code or any law or regulation.

48.     Under a section entitled WE STAND FOR OUR SHAREHOLDERS, the Code of Conduct states as follows:

> We act honestly and transparently with our shareholders.  We spend and invest Their money wisely, as if it were our own.  We follow the letter and the spirit of the law in reporting our financial performance.  In so doing, we maintain the trust investors have placed in us.
>
> **HERE'S HOW WE DO IT:**
>
> ***Corporate Governance***:  We have an effective governance and compliance infrastructure that helps achieve our business objectives and create value for our shareholders. This includes the ethical behavior of our management team and our open and responsive approach to concerns raised by others.  Our Board of Directors periodically reviews our key governance documents and policies.  In addition, we update our Board regarding fiduciary duties and other governance matters as appropriate and invite our Board to attend numerous training opportunities each year.  Our Board's Compensation Committee follows a philosophy that awards incentives to corporate officers to achieve our operational and strategic goals, which aligns our interests with those of our shareholders.

***Insider Trading:*** We treat "inside information" appropriately and lawfully. Anyone who has material inside information about ScottsMiracle or a ScottsMiracle customer, supplier or competitor must not use it for personal gain or provide it to others.

***Confidentiality of Company Information:*** We consider every piece of information we own as an asset, and we are careful to safeguard our confidential information. We do not reveal confidential or non-public information about the Company, our customers, suppliers, vendors or anyone else. We respond to legitimate inquiries from our stakeholders without releasing confidential information or violating securities laws.

***External Communications/Social Media:*** Generally, our Corporate Communications and Investor Relations Departments manage external communications about ScottsMiracle. When using social media services to communicate about our products and services, we are truthful, respectful of others, and transparent in disclosing our relationship with ScottsMiracle.

***Conflicts of Interest:*** We do not take advantage of an opportunity that belongs to the Company for our own personal gain. We appreciate that opportunities that we discover through our work here or as a result of Company property or information belong to ScottsMiracle. We do not engage in activities that create, or even appear to create, conflict between our personal interests and the interests of ScottsMiracle.

***Accuracy in Business Records and Financial Reporting:*** We are committed to integrity and honesty in financial reporting to protect our financial strength and reputation. This includes not only financial accounts, but other records such as quality reports, time records, expense reports, benefits claim forms and employment applications. We do not enable another person's efforts to evade taxes or local currency laws.

49.    The Company has also adopted the Corporate Governance Guidelines ("Corporate Guidelines") "in order to codify internal Board policies and procedures." The Corporate Guidelins reflect the Board's "current views with respect to certain matters of Board composition and practice."

50.    According to the Corporate Guidelines, the responsibilities of the members of the Board "is to exercise their business judgment in accordance with applicable law and to act in what they reasonably believe is in the best interests of the Company and its shareholders."

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

51. The Corporate Guidelines also provide that the "business of the Company is conducted by its employees and officers under the direction of the [CEO] and the oversight of the Board." Among the specific functions imposed by the Corporate Guidelines to the Board are "reviewing, approving and monitoring fundamental financial and business strategies and major corporate actions; and reviewing the Company's processes for maintaining the integrity of [its] financial statements, the Company's compliance with law and the Company's compliance with its public disclosure obligations."

## DIRECTOR DEFENDANTS ON CERTAIN COMMITTEES OWE ADDITIONAL DUTIES

52. The Audit Committee Charter (the "Audit Charter") places additional duties and responsibilities upon the members of the Board's Audit Committee, which consisted of Avilés, Evans, Kelly, Mistretta, and Volas during certain times of the Relevant Period.

53. According to the Audit Charter, the Audit Committee is responsible for the following:

> Assisting the Board in the oversight of (i) the integrity of the Company's financial statements and financial reporting process, (ii) the Company's compliance with legal and regulatory requirements (collectively, "Applicable Rules"), (iii) the qualification, independence and performance of the Company's independent registered public accounting firm (the "External Auditor"), (iv) the performance of the Company's internal audit function, and (v) the performance of other Committee functions as set forth in this charter.

54. Pursuant to the Audit Charter, the overarching duties of the Audit Committee and its members include the following:

***Independent Audit***

*     *     *

> 7. Discuss with the External Auditor the matters required to be described by Auditing Standard No. 16, Communications with Audit Committees, as adopted by the Public Company Accounting Oversight Board, including, without limitation, any difficulties encountered in the course of the work, scope and timing of the audit

plan, including the External Auditor's review of internal control over financial reporting, overall audit strategy and any restriction on the scope of the External Auditor's activities or on access to requested information, and any significant disagreements with management.

*     *     *

9. Obtain a report from the External Auditor regarding the following: (i) All critical accounting policies and practices. (ii) All alternative treatments of financial information within generally accepted accounting principles related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the External Auditor. (iii) Other material written communications between the External Auditor and management, including but not limited to the management letter and schedule of unadjusted differences.

### *Disclosure and Financial Reporting*

10. Review and discuss with management and the External Auditor the Company's consolidated annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under the section "Management's Discussion and Analysis of Financial Condition and Results of Operation", prior to filing with the [SEC] and recommend whether the annual audited financial statements should be included in the Company's annual report on Form 10-K.

11. Review management's report on internal control over financial reporting prior to its inclusion in the annual report on Form 10-K.

12. Review major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, major issues as to the adequacy of the Company's internal controls, and any special audit steps adopted in light of material control deficiencies.

13. Prepare the [Audit] Committee report required by the proxy rules of the SEC to be included in the Company's annual proxy statement.

14. Discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies, prior to issuance and in accordance with Applicable Rules.

15. Receive and review any disclosure from the Company's CEO and CFO made in connection with the certification of the Company's quarterly and annual reports filed with the SEC of: (a) significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Company's ability to record, process, summarize, and report financial data; and (b) any fraud, whether or not material, that involves

management or other employees who have a significant role in the Company's internal control over financial reporting.

16. Review other relevant reports or financial information submitted by the Company to the public, the SEC, or any other governmental body that oversees financial reporting, including management certifications as required in Item 601(b)(31) of Regulation S-K and relevant reports rendered by the independent auditor (or summaries thereof).

***Other Matters***

17. Discuss with management and the External Auditor the significant financial reporting and disclosure items emphasized by Applicable Rules, including, for example: (i) critical accounting policies and practices; (ii) liquidity; (iii) special purpose entities and off-balance sheet transactions; and (iv) related person transactions.

18. Review the following matters related to the Company's financial reporting process: (i) whether there were any significant financial reporting issues discussed during the period and, if so, how they were resolved and whether a second opinion was sought; (ii) major issues regarding accounting principles and financial statement presentations; (iii) the nature of any material correcting adjustments identified by the External Auditor; (iv) the use of pro-forma figures in any SEC filings or other public disclosure, release, or pre-release; (v) the methods used to account for significant unusual transactions; (vi) the substance of any significant litigation, contingencies or claims that had, or may have, a significant impact on the financial statements; (vii) reports from the External Auditor regarding alternative treatments of financial information within generally accepted accounting principles that the External Auditor has discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the External Auditor; (viii) adjusting non-GAAP entries; (ix) the effect of regulatory and accounting initiatives as well as off-balance-sheet structures on the financial statements of the Company; (x) integrity of the external and internal financial reporting process; and (xi) the effect of regulatory and accounting initiatives on the Company's financial statements.

19. Take the following actions regarding legal and regulatory compliance: (i) review and discuss the effect of regulatory and accounting initiatives with management and the External Auditor; and (ii) review and discuss the Company's compliance with legal and regulatory requirements that could have a significant impact on the Company's financial statements with management and the External Auditor.

\*       \*       \*

21. Oversee management's arrangement for the prevention and deterrence of fraud.

22. Ensure that appropriate action is taken against known fraud perpetrators.

*Oversight of the Internal Audit Function*

23. Discuss with management, the Chief Internal Auditor and the External Auditor the internal audit function, the adequacy and scope of the annual internal audit plan, budget and staffing, and any recommended material changes in the planned scope of the annual internal audit plan. The Chief Internal Auditor may at any time, at such person's option or at the direction of the [Audit] Committee, report on any matter directly to the Committee. The [Audit] Committee has the authority to meet privately with any and all internal audit staff at any time, or from time to time, at the Committee's sole discretion. The [Audit] Committee will review and concur in the appointment, replacement, performance, and compensation for the Company's Chief Internal Auditor, who shall report directly to the [Audit] Committee for functional purposes, but report to the Company's Chief Financial Officer for administrative purposes.

24. Periodically review, with the Chief Internal Auditor, any significant difficulties, disagreements with management, or scope restrictions encountered in the course of the function's work.

*    *    *

26. Review the materials (e.g., reports, memos, etc.) that the Chief Internal Auditor provides to the Committee.

27. Periodically inquire of the Chief Internal Auditor regarding the steps taken to comply with the Institute of Internal Auditors professional standards and the internal audit function's internal policies.

*Oversight of Internal Controls*

28. Review and discuss with management and the External Auditor the assessment of the effectiveness of the Company's internal control over financial reporting and the report on internal control over financial reporting made by management and the attestation report of the External Auditor on the Company's internal control over financial reporting, in each case as required by Applicable Rules.

29. Review at least annually steps adopted to address any material control deficiencies and significant internal control recommendations identified through the internal or external audit process and ensure that appropriate corrective actions are instituted.

30. Establish and oversee procedures for: (i) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls, auditing matters, or other compliance matters; and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding accounting or auditing matters.

*    *    *

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

32. Receive reports on matters of significance arising from work performed by other providers of internal control assurance to senior management and the Board.

### *General Compliance and Oversight*

33. Meet separately with management, the Chief Internal Auditor, and the External Auditor periodically.

34. Report to the Board and review with the Board any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the qualifications, performance, and independence of the External Auditor, or the performance of the internal audit function.

35. Establish such other rules and operating procedures in order to fulfill its obligations under this Charter and Applicable Rules as and when the Committee deems necessary or appropriate.

36. Review, no less frequently than quarterly, with the [CEO] and the [CFO] the Company's disclosure controls and procedures and management's conclusions about the adequacy of such disclosure controls and procedures.

55.     The Finance Committee Charter (the "Finance Charter") places additional duties and responsibilities upon the members of the Board's Finance Committee, which consisted of Avilés, Evans, Finn, Hanft, Kelly, Littlefield, Mistretta, Shumlin, and Volas at certain times during the Relevant Period.

56.     The Finance Committee is "responsible for assisting the Board in the oversight of (i) the finance and investment functions of the Company [and] (ii) the financing and financial structure of proposed acquisitions and divestitures in which the Company engages as part of its business strategy from time to time.

57.     Among the responsibilities imposed by the Finance Charter to the Finance Committee Defendants are as follows:

1. Review at least annually the Company's corporate financing matters (including matters relating to the Company's credit facility and any proposed offering of its common shares or debt securities), financial structure, the investment of funds and the purchase or sale of any derivative securities (including, but not limited to, puts and calls on the Company's common shares, interest rate locks, foreign currency,

and commodity hedges and similar matters), and make recommendations to the Board regarding such matters as and when the Committee deems necessary or appropriate. Notwithstanding the foregoing, the Committee is delegated the authority to approve administrative, ministerial or ordinary course actions related to corporate financing matters and issuances of equity and/or debt financing not to exceed $250 million during the fiscal year.

2. Review at least annually the cash flow, credit capacity, and covenant forecasts of the Company as they are updated and analyzed throughout each fiscal year and make recommendations to the Board regarding such matters as and when the Committee deems necessary or appropriate.

\* \* \*

4. Review at least annually the Company's stock repurchase policies and plans and make recommendations to the Board regarding such actual or potential stock repurchases as and when the Committee deems necessary or appropriate.

5. Review at least annually reports from management regarding the funded status, funding practices and policies, and any applicable actuarial, discount, trend rates or similar assumptions of all significant employee benefit or similar plans of which the Company or an affiliate is a sponsor and the existing and anticipated liabilities with respect to such plans, and make recommendations to the Board regarding such matters as and when the Committee deems necessary or appropriate.

6. Review at least annually management reports regarding the investment policies and investment performance of those assets which the SMG Investment Committee, appointed by the Company's [CFO], has the responsibility to manage or which are held in conjunction with any Company or affiliate employee benefit or similar plan, and make recommendations to the Board regarding such matters as and when the Committee deems necessary or appropriate.

7. Review and make recommendations to the Board at least annually regarding the Company's capital expenditures and operating budget. Also, review at least annually the Company's financial authority limits.

\* \* \*

9. Oversee the development of and adherence to a process for Board oversight of mergers, acquisitions and divestiture transactions, as well as other corporate transactions or agreements that significantly affect the Company's business, operations and/or strategic direction. Make recommendations to the Board regarding size limits where Committee approval is sufficient to improve Board efficiency.

10. Advise the Board regarding approval of acquisitions and divestitures and other corporate transactions that require Board approval, including the financing and

financial structure of proposed acquisitions and divestitures where the size of the proposed transaction exceeds the authority levels delegated to management.

## BACKGROUND

58.     ScottsMiracle is a leading multinational corporation in the lawn care, gardening, and hydroponics industries. Founded in 1868, ScottsMiracle has grown to become the world's largest marketer of branded consumer lawn and garden care products.

59.     ScottsMiracle operates through three primary reportable segments: (a) U.S. Consumer: This segment focuses on consumer lawn and garden products, including fertilizers, grass seed, mulch, pest control, and weed prevention products; (b) Hawthorne: Established in 2014 as a wholly-owned subsidiary, Hawthorne Gardening Company specializes in hydroponic equipment and supplies, primarily serving the emerging cannabis cultivation market; (c) Other: This segment encompasses the Company's international consumer operations and other miscellaneous business activities.

60.     The Company's main brands include ScottsMiracle®, Miracle-Gro®, and Ortho®. Additionally, ScottsMiracle serves as the exclusive agent for Monsanto in the marketing and distribution of consumer Roundup® products.

61.     ScottsMiracle primarily distributes its products through third-party retailers, including home improvement centers, mass merchandisers, warehouse clubs, and garden centers. This business model makes the Company heavily reliant on maintaining strong relationships with its retail partners and accurately forecasting consumer demand.

62.     As the largest marketer of branded consumer lawn and garden products, ScottsMiracle held a dominant position in its primary markets.  However, the Company faced increasing competition, particularly in the emerging cannabis cultivation supply market through its Hawthorne segment.

63. The lawn and garden care industry is characterized by seasonality, with the majority of sales occurring in the spring and early summer months. This seasonality creates challenges in inventory management and cash flow, requiring careful planning and forecasting.

64. The hydroponics market, served by the Hawthorne segment, experienced rapid growth and increased volatility during the Relevant Period, influenced by changing regulations and market dynamics in the cannabis industry.

65. In the years 2020 and 2021, ScottsMiracle experienced a surge in demand for its products, partly driven by increased interest in home gardening during the COVID-19 pandemic. However, the Company was unable to fully capitalize on this opportunity due to insufficient inventory levels, resulting in millions of dollars in lost sales.

66. In response to this experience, ScottsMiracle made the decision to significantly increase its inventory levels for both the U.S. Consumer and Hawthorne segments. The stated goal was to ensure the Company could adequately service the needs of its retail partners and avoid missing out on potential sales opportunities.

67. This decision to boost inventory levels coincided with the Company's need to maintain compliance with its debt covenants, particularly the leverage ratio requirement of less than 6.25.

68. Throughout the Relevant Period, ScottsMiracle operated under significant financial leverage. The Company had entered into senior secured credit facilities that imposed various restrictive covenants and cross-default provisions.

69. One of the key covenants required ScottsMiracle to maintain a debt-to-EBITDA ratio (also known as a "leverage ratio") of less than 6.25. This covenant was particularly crucial,

as any breach could potentially trigger a default, allowing lenders to declare all outstanding indebtedness immediately due and payable.

## DEFENDANTS BREACH THEIR DUTIES
## TO THE COMPANY AND ITS STOCKHOLDERS

70.     Through a series of communications, Defendants made materially false and misleading statements and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors (i) that the Company was flooding the market with excess inventory, pressuring retailers to purchase more products than needed or wanted; (ii) thus, ScottsMiracle did not have a strong demand for its product and was struggling with inventory saturation; (iii) that the Company was close to breaching its loan covenant requirements; (iv) therefore, they improperly changed how the Company calculated EBITDA in the fourth quarter of the 2022 fiscal year to remain compliant with debt covenants; (v) they failed to maintain adequate internal controls over financial reporting; and vi) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

71.     On June 1, 2021, after market hours,  ScottsMiracle issued a press release announcing it had "increased sales and earnings guidance for fiscal 2021 based on the continued strength of both its U. S. Consumer and Hawthorne segments" and that the Company now expected "company-wide sales growth of 17 to 19 percent" for its fiscal year ending September 30, 2021. Press Release, The Scotts Miracle-Gro Company, ScottsMiracle-Gro Increases Fiscal 2021 Guidance Led by Continued Strength in Both U.S. Consumer and Hawthorne Segments (June 1, 2021) (the "June 1, 2021 Press Release").  According to the June 1, 2021 Press Release, the revision was due primarily "to stronger growth in the U.S. Consumer segment, where the Company now expects sales growth of 7 to 9 percent, compared with its previous range of 4 to 6 percent."

With respect to the Company's Hawthorne segment, the press release indicated that "Hawthorne sales also continue to exceed expectations as the Company now expects sales growth of 40 to 45 percent for the full year, compared with previous guidance of 30 to 40 percent growth." The press release continued, stating that "[a]s a result, adjusted non-GAAP earnings are expected to be in a range of $9.00 to $9.30 per share" and that "[t]his compares to the previous guidance of $8.60 to $9.00 per share."

72. On June 2, 2021, during the William Blair & Company 41st Annual Growth Stock Conference, Defendant Miller commented on the increased guidance and noted that, despite prior seasonality issues, "we're still raising our guidance . . . on sales in both the U.S. Consumer business and Hawthorne." Defendant Miller then explained that the Company "now expect[s] growth of 7% to 9% in the U.S. Consumer business versus a previous guidance range of 4% to 6%." Regarding the Hawthorne segment, Defendant Miller highlighted that ScottsMiracle "now expect[s] growth of 40% to 45% versus a previous range of 30% to 40%."

73. On August 4, 2021, ScottsMiracle issued a press release announcing its third quarter 2021 financial results for the period ending on July 3, 2021. Press Release, The Scotts Miracle-Gro Company, ScottsMiracle-Gro Announces Record Third Quarter Financial Results; Reaffirms Sales and Earnings Guidance for Fiscal 2021 (Aug. 4, 2021) (the "August 4, 2021 Press Release"). During the related earnings call, Defendant Miller reported that for the U.S. Consumer business, ScottsMiracle was replenishing "categories to keep the stores at the right level of inventory" and emphasized that ScottsMiracle has a "good line of sight here, which gives us a high degree of confidence in our guidance."

74. On November 3, 2021, ScottsMiracle issued a press release announcing its fourth quarter and full year 2021 financial results for the period ending on September 30, 2021. Press

Release, The Scotts Miracle-Gro Company, ScottsMiracle-Gro Announces Record Full Year Results as Fourth Quarter Sales Exceed Expectations in U.S. Consumer Segment (Nov. 3, 2021) (the "November 3, 2021 Press Release"). Therein, ScottsMiracle reported Adjusted EBITDA for full fiscal year 2021 of $902.6 million, an increase from the $776.6 million of Adjusted EBITDA the Company had reported for full fiscal year 2020. In the November 3, 2021 Press Release, the Company highlighted that ScottsMiracle's "leverage ratio at the end of the quarter was approximately 2.7 times average debt-to-EBITDA."

75.     During the related earnings call, Defendant J. Hagedorn claimed, "we see a higher level of sustainable growth with our existing brands . . . based largely on our ability to reach a new generation of consumers." Defendant J. Hagedorn also emphasized that the Company "just finished [its] third straight record year and remain extremely optimistic." He further stated that "every cut of the data tells us [consumers] have stayed with the category and our brands throughout this past season." Defendant Miller added,that "as it relates to inventory, we find ourselves in a very good place right now."

76.     On November 23, 2021, ScottsMiracle filed its full-year 2021 report on Form 10-K with the SEC. The Scotts Miracle-Gro Company, Annual Report (Form 10-K) (November 23, 2021). ("2021 Form 10-K"). The 2021 Form 10-K was signed by Defendants J. Evans, Finn, J. Hagedorn, Hanft, Johnson, Kelly, Littlefield, Miller, Mistretta, Shumlin, Vines, and Volas. The 2021 Form 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Miller and J. Hagedorn. The 2021 Form 10-K contained the following risk factor, in relevant part:

> *If we underestimate or overestimate demand for our products and do not maintain appropriate inventory levels, our net sales and/or working capital could be negatively impacted.* Our ability to manage our inventory levels to meet our customers' demand for our products is important for our business. Our production

levels and inventory management goals for our products are based on estimates of demand, taking into account production capacity, timing of shipments, and inventory levels. If we overestimate or underestimate both channel and retail demand for any of our products during a given season, we may not maintain appropriate inventory levels, which could negatively impact our net sales, profit margins, net earnings, and/or working capital, hinder our ability to meet customer demand, result in loss of customers, or cause us to incur excess and obsolete inventory charges. [Emphasis added].

77.     The 2021 Form 10-K reported an adjusted EBITDA for the full year of $902.6 million and further stated that "[t]he Company's leverage ratio was 2.70 at September 30, 2021."

78.     On February 1, 2022, ScottsMiracle issued a press release announcing its first quarter of 2022 financial results for the period ending January 1, 2022. Press Release, The Scotts Miracle-Gro Company, ScottsMiracle-Gro Announces First QuarterResults; Increases Full-Year Sales Outlook for U.S. Consumer Segment (Feb. 1, 2022) (the "February 1, 2022 Press Release"). Therein, the Company announced that it was increasing its full-year U.S. Consumer segment sales guidance due to "better-than-expected results in the U.S. Consumer, coupled with the additional pricing actions that will take effect in the third quarter."

79.     During the related earnings call, Defendant Miller reported the Company's leverage ratio was at "3.3 times at the end of Q1." During the question-and-answer portion of the call, an analyst from William Blair noted that, with respect to the U.S Consumer segment, the Company had "taken [its] numbers up for the year for that segment, which suggests a certain degree of confidence." The analyst then inquired whether the confidence was coming from "some of the real time data" the Company was seeing through its point of sale ("POS"). In response, Defendant J. Hagedorn stated that the "POS data for sure is good" before noting that the Company realized a "much earlier and successful kind of load into retail."

80.     On February 9, 2022, the Company filed its first quarter 2022 financial report on Form 10-Q for the period ending January 1, 2022, signed by Defendant Miller and containing SOX

certifications by Defendants Miller and J. Hagedorn. The ScottsMiracle-Gro Company, Quarterly Report (Form 10-Q) (February 9, 2022). ("Q1 2022 Form 10-Q") The Q1 2022 Form 10-Q stated that "[t]he Company's leverage ratio was 3.32 at January 1, 2022."

81.     On May 3, 2022, the Company issued a press release announcing its second quarter 2022 financial results for the period ending April 2, 2022. Press Release, The Scotts Miracle-Gro Company, ScottsMiracle-Gro Announces Record Second Quarter U.S. Consumer Sales; Lawn & Garden Demand GainingGround After Weather-Driven Delays (May 3, 2022) (the "May 3, 2022 Press Release"). The May 3, 2022 Press Release reported ScottsMiracle's Adjusted EBITDA for the quarter as $429.6 million. During the related earnings call, Defendant Miller noted that the Company's "leverage ratio" now stood at "3.8 times" adjusted EBITDA.

82.     During the same call, Defendant J. Hagedorn admitted that "the lack of capacity in the short term meant we also had to build and hold more inventory to ensure we could service the needs of our retail partners." Nevertheless, he assured investors that the Company was "tracking to do even better," and that weather was ScottsMiracle's "biggest challenge" when dealing with moving inventory. Additionally, Defendant J. Hagedorn added that even though there was an excess in inventories, "peak selling is happening now."

83.     On May 11, 2022, the Company filed its Quarterly Report on Form 10-Q for the second quarter of 2022, signed by Defendant Miller and containing SOX certifications signed by Defendants Miller and Hagedorn. The Scotts Miracle-Gro Company, Quarterly Report (Form 10-Q) (May 11, 2022). ("Q2 2022 Form 10-Q"). The Q2 2022 Form 10-Q stated that "[t]he Company's leverage ratio was 3.81 at April 2, 2022."

84.     The above statements identified in ¶¶ 71-83 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and

prospects. To avoid breaching the Company's debt covenant requirements, the Individual Defendants caused ScottsMiracle to engage in a series of deceptive practices:

a. They flooded the market with excess inventory, pressuring retailers to purchase more products than needed or wanted;

b. They misrepresented the Company's inventory levels and sales performance, claiming strong demand and "record shipments" when in reality, ScottsMiracle was struggling with inventory saturation;

c. They falsely assured investors that the Company was "comfortably within" its debt covenant requirements when, in fact, ScottsMiracle was dangerously close to breaching these covenants;

d. They improperly changed how the Company calculated EBITDA in the fourth quarter of the 2022 fiscal year to remain compliant with debt covenants; and

e. They failed to maintain adequate internal controls over financial reporting.

f. As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

## THE COMPANY ISSUES FALSE AND MISLEADING PROXY STATEMENTS

85. On December 15, 2021, ScottsMiracle filed a proxy statement on Schedule 14A with the SEC. The Scotts Miracle-Gro Company, Proxy Statement (Form DEF 14A) (Dec. 15, 2021) (the "2021 Proxy Statement"). Defendants Evans, Finn, Hagedorn, Hanft, Johnson, Kelly, Littlefield, Mistretta, Shumlin, Vines, and Volas solicited the 2021 Proxy Statement. The 2021 Proxy Statement contained material misstatements and omissions.

86. The 2021 Proxy Statement asked ScottsMiracle stockholders to vote to, among other things, (1) reelect Defendants Evans, Hanft, Johnson, and Littlefield to the Board for a three-year term ending as of the Company's annual meeting of stockholders in fiscal year 2025; (2) ratify the appointment of Deloitte & Touche LLP ("Deloitte") as ScottsMiracle's independent registered public accounting firm for the fiscal year ending September 30, 2022; (3) approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, commonly referred to as "Say-on-pay"; and (4) approve an amendment and restatement of ScottsMiracle's Long-Term Incentive Plan (the "Plan") to, among other things, increase the maximum number of common shares available for grant to participants.

87. The 2021 Proxy Statement sought the approval of the Plan as follows:

The amendment and restatement of the Plan includes the following changes to the Plan:

> • *Increase in Aggregate Share Limit*. The amendment and restatement increases the maximum number of common shares available for grant to participants under the Plan by 1,500,000 common shares.
>
> • *Share Limits for Incentive Stock Options*. The amendment and restatement provides that the aggregate limit for incentive stock option awards made on or after January 24, 2022 is 2,892,894 common shares.
>
> • Since the Plan was amended and restated on January 27, 2017, the deduction limit for certain performance-based compensation under IRC § 162(m) was repealed. As a result, the amendment and restatement has generally removed specific language such as the definition of "Performance-Based Compensation," and other limitations and restrictive provisions, including per share annual award limits for Plan participants other than non-employee directors, that were previously included in the Plan solely for purposes of complying with the performance-based pay exception under IRC § 162(m).
>
> • *Performance Goals.* The amendment and restatement expands the Performance Goals that the Compensation and Organization Committee ("Compensation Committee") may consider when setting Performance Goals for performance-based awards.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

• *Extension of Plan Expiration Date*. Currently, the authority to grant new awards under the Plan will expire on January 27, 2027. The amendment and restatement of the Plan extends the expiration date of the Plan until January 24, 2032.

We refer to the Plan as modified by the proposed amendment and restatement as the "Amended Plan." A copy of the Amended Plan is attached to this Proxy Statement as Annex A. Capitalized terms that are used but not defined in this proposal are defined in the Amended Plan. The Amended Plan will become effective only if it is approved by our shareholders.

88. The Plan was purportedly designed to align the interests of management with those of stockholders by tying compensation to the Company's financial performance and stock price. However, this amendment called for investors to vote in favor of increasing the number of shares available under the Plan based on the Company's materially misleading and/or false statements. Ultimately, this amendment increased the number of shares available under the Plan, benefitting the Individual Defendants.

89. On December 14, 2022, ScottsMiracle filed a proxy statement on Schedule 14A with the SEC. The Scotts Miracle-Gro Company, Proxy Statement (Form DEF 14-A) (Dec. 14, 2022) (the "2022 Proxy Statement") (together with the 2021 Proxy Statement, the "Proxy Statements"). Defendants Evans, Finn, J. Hagedorn, Hanft, Johnson, Kelly, Littlefield, Mistretta, Sandoval, Shumlin, Vines, and Volas solicited the 2022 Proxy Statement. The 2022 Proxy Statement contained material misstatements and omissions.

90. The 2022 Proxy Statement asked ScottsMiracle stockholders to vote to, among other things, (1) reelect Defendants J. Hagedorn, Mistretta, and Volas to the Board for a three year term ending as of the Company's annual meeting of stockholders in fiscal year 2026; (2) ratify the appointment of Deloitte as ScottsMiracle's independent registered public accounting firm for the fiscal year ending September 30, 2023; (3) approve, in a non-binding advisory vote, the compensation of the Company's named executive officers, commonly referred to as "Say-on-pay";

and (4) to approve an amendment and restatement of the Plan to, among other things, increase the maximum number of common shares available for grant to participants.

91.     The 2022 Proxy Statement sought approval of a further amendment to the Plan as follows:

> The amendment and restatement of the Plan includes the following changes to the Plan:
>
> •*Increase in Aggregate Share Limit*. The amendment and restatement increases the maximum number of common shares available for grant to participants under the Plan by 2,300,000 common shares.
>
> •*Performance Goals*. The amendment and restatement expands the Performance Goals that the Compensation Committee may consider when setting Performance Goals for performance-based awards.
>
> \*       \*       \*
>
> **Background**
>
> The Compensation Committee believes it is desirable to continue to have equity-based awards available under a long-term incentive plan to be used to recruit new employees, directors or third-party service providers and for incentive purposes, where necessary or appropriate. The Amended Plan will continue to make common shares available for a variety of awards, allowing the Company to choose the incentives most appropriate to individual circumstances. The Amended Plan is intended to benefit the Company and its shareholders.
>
> \*       \*       \*
>
> **Determination of Shares to be Available for Issuance**
>
> The Compensation Committee approved the additional share authorization requested under the proposed Amended Plan based, in part, on a belief that the number of common shares currently available under the Plan does not give us sufficient flexibility to adequately provide for future incentives. We will continue to have the authority to grant awards under the Plan, within the existing Plan limits, if shareholders do not approve this proposal; however, the Company's flexibility to grant future awards under the Plan may be limited.

92.     The Plan was purportedly designed to align the interests of management with those of stockholders by tying compensation to the Company's financial performance and stock price. However, this amendment called for investors to vote in favor of increasing the number of shares

available under the Plan based on the Company's materially misleading and/or false statements. Ultimately, this amendment increased the number of shares available under the Plan, benefitting the Individual Defendants.

93.     With respect to the Board's role in risk oversight, the Proxy Statements stated the following substantially similar statements:

**Board Role in Risk Oversight**

It is management's responsibility to develop and implement the Company's strategic plans and to identify, evaluate, manage and mitigate the risks inherent in those plans. It is the Board's responsibility to oversee the Company's strategic plans and to ensure that management is taking appropriate action to identify, evaluate, manage and mitigate the associated risks. The Board administers its risk oversight responsibilities both through active review and discussion of enterprise-wide risks and by delegating certain risk oversight responsibilities to Board committees for further consideration and evaluation. The decision to administer the Board's oversight responsibilities in this manner significantly impacts the Board's leadership and committee structure.

Because the roles of Chairman of the Board and CEO are combined, the directors annually elect a Lead Independent Director to enhance oversight of management and the potential risks facing the Company. In addition, the Board is comprised of predominantly independent directors and all members of the Board's key committees—the Audit Committee, the Compensation Committee, and the Governance Committee—are independent. The checks and balances provided by our leadership structure help to ensure that key decisions made by the Company's senior management, up to and including the CEO, are reviewed and overseen by independent directors of the Board.

In some cases, risk oversight is addressed by the full Board as part of its engagement with the CEO and other members of senior management. For example, the full Board conducts a comprehensive annual review of the Company's overall strategic plan and the plans foreach of the Company's business units, including associated risks. In connection with the Board's risk oversight responsibilities, management periodically provides the Board with reports regarding the significant risks facing the Company and how the Company is seeking to control or mitigate those risks. The Board also has responsibility for ensuring that the Company maintains appropriate succession plans for its senior officers and conducts an annual review of succession planning.

In other cases, the Board has delegated risk management oversight responsibilities to certain committees, each of which reports regularly to the full Board. For example, the Audit Committee oversees the Company's compliance with legal and

regulatory requirements and its overall risk management process and has oversight responsibility for financial risks. As part of its oversight role, the Audit Committee regularly reviews risks relating to the Company's key accounting policies and receives reports regarding the Company's most significant internal controls and compliance risks from the Company's Chief Financial Officer as well as its internal auditors. Representatives of the Company's independent registered public accounting firm attend each Audit Committee meeting, regularly make presentations to the Audit Committee, and comment on management presentations. In addition, the Company's Chief Financial Officer and internal auditors, as well as representatives of the Company's independent registered public accounting firm, individually meet in private session with the Audit Committee on a regular basis, affording ample opportunity to raise any concerns with respect to the Company's risk management practices.

94. The Proxy Statements included substantially similar responsibilities of the Audit Committee:

The Audit Committee is responsible for: (1) overseeing the accounting and financial reporting processes of the Company, including the audits of the Company's consolidated financial statements; (2) appointing, compensating and overseeing the work of the independent registered public accounting firm employed by the Company; (3) establishing procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, auditing matters or other compliance matters;(4) assisting the Board in its oversight of: (a) the integrity of the Company's consolidated financial statements, (b) the Company's compliance with applicable laws, rules and regulations, including applicable NYSE Rules, (c) the independent registered public accounting firm's qualifications and independence, and (d) the performance of the Company's internal audit function; (5) overseeing the Company's risk management protocols including the establishment of policies and guidelines, the identification of major risk exposures and monitoring and mitigation efforts with respect to such risks; and (6) undertaking the other matters required by applicable NYSE Rules and SEC Rules.

95. The Proxy Statements were materially misleading because they failed to disclose that: (i) contrary to the Proxy Statements' descriptions of the Board's risk oversight responsibilities, the Board and its committees did not adequately exercise these functions and were causing or permitting ScottsMiracle to issue false and misleading statements; (ii) the Individual Defendants allowed the Insider Trading Defendants to sell stock at artificially inflated prices while in possession of material non-public information; and (iii) the Individual Defendants used "pay-

for-performance" rewards when calculating executive compensation despite artificially inflating the Company's value by issuing false and misleading statements.

96.     The Proxy Statements were further materially misleading because they failed to disclose to investors that to avoid breaching the Company's debt covenant requirements, the Individual Defendants caused ScottsMiracle to engage in a series of deceptive practices:

    a.     They flooded the market with excess inventory, pressuring retailers to purchase more products than needed or wanted;

    b.     They misrepresented the Company's inventory levels and sales performance, claiming strong demand and "record shipments" when, in reality, ScottsMiracle was struggling with inventory saturation;

    c.     They falsely assured investors that the Company was "comfortably within" its debt covenant requirements when, in fact, ScottsMiracle was dangerously close to breaching these covenants;

    d.     They improperly changed how the Company calculated EBITDA in the fourth quarter of the 2022 fiscal year to remain compliant with debt covenants; and

    e.     They failed to maintain adequate internal controls over financial reporting.

As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

97.     The omissions and false and misleading statements in the Proxy Statements are material in that a reasonable investor would consider them important in deciding how to vote on the re-election of directors and the approval and amendment of the Plan. Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of

information made available in the Proxy Statements and in other information reasonably available to stockholders.

### THE INSIDER TRADING DEFENDANTS SELL
### COMPANY STOCK AT ARTIFICIALLY INFLATED PRICES

98.     During the period of wrongdoing described above, ScottsMiracle insiders sold Company stock at artificially inflated prices while in possession of material non-public Company information.

99.     The Insider Trading Defendants sold Company stock while it was trading at artificially inflated prices due to the false and misleading statements alleged herein and while they were in possession of material non-public Company information:

- During the Relevant Period, Defendant Evans sold 4,659 shares of Company stock for proceeds of over $298,000.

- During the Relevant Period, Defendant C. Hagedorn sold 28,106 shares of Company stock for proceeds of almost $4 million.

- During the Relevant Period, Defendant J. Hagedorn sold 348,483 shares of Company stock for proceeds of over $42 million.

- During the Relevant Period, Defendant Johnson sold 6,800 shares of Company stock for proceeds of almost $538,000.

- During the Relevant Period, Defendant Miller sold 3,695 shares of Company stock for proceeds of over $519,000.

- On November 11, 2022, Defendant Shumlin sold 750 shares of Company stock for proceeds of almost $43,000.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

100.    While many of the Company's stockholders lost significant money with the shares dropping substantially, the Insider Trading Defendants sold their shares at artificially high prices and avoided the staggering losses suffered by stockholders.

101.    As a result, the Insider Trading Defendants benefitted from the artificial inflation of the price of the Company's stock and the resulting increase in the value of ScottsMiracle stock and stock options they held.

### THE TRUTH BEGINS TO EMERGE, AND THE INDIVIDUAL DEFENDANTS DOUBLE DOWN ON THEIR FALSE AND MISLEADING STATEMENTS

102.    On June 8, 2022, the truth began to emerge when ScottsMiracle issued a press release admitting that the Company "did not see the replenishment orders [it] expected from its retail partners since mid-May" and that "retailer orders were more than $300 million below our plans for the month in the U.S Consumer segment alone." Press Release, The Scotts Miracle-Gro Company, ScottsMiracle-Gro Reduces Outlook for Sales and Non-GAAP Adjusted EPS Despite Strong Recovery in Consumer Lawn & Garden Participation (June 8, 2022) (the "June 8, 2022 Press Release"). Describing the sales decline as a "trend," the June 8, 2022 Press Release noted the sales miss "put significantly greater pressure on our fixed cost structure."

103.    The June 8, 2022 Press Release further revealed that the Company was slashing its fiscal year 2022 sales guidance and that ScottsMiracle planned to take on additional debt to cover restructuring charges as it attempted to cut costs:

> Adjusted earnings per share are now expected in a range of $4.50 to $5.00. U.S. Consumer sales are expected to decline 4 to 6 percent. Hawthorne sales are now expected to decline 40 to 45 percent for the year ending September 30, 2022. Entering May, Hawthorne sales had begun to show signs of strengthening but momentum in the business slowed again during the  month as expected improvement in outdoor cultivation has been slow to materialize.

> "The changes we have seen since our last public comments in early May are clearly not what we would have expected," Hagedorn said. "The revised guidance we are providing is our best estimate of where things currently stand in a fluid and rapidly

evolving market. While we are striving to deliver the best outcome for fiscal 2022, our focus is shifting toward the future. We are committed to taking decisive steps to improve our margins and cash flow in fiscal 2023 and get the business back to a level of performance that our shareholders rightfully expect."

The Company also said it is engaged in highly productive discussions with its lenders to obtain a temporary increase in the leverage ratio allowed under a revised credit facility.

"We have stated for years that our comfort zone for leverage is 3.5 times debt-to-EBITDA and current facility allows for leverage up to 4.5 times," said Cory Miller, executive vice president and chief financial officer. "Given the external factors currently impacting the business, we are seeking to adjust our debt covenants to allow for up to two additional turns of leverage in the near-term to maintain the appropriate level of flexibility in navigating the current market conditions. Obviously, we are focused on implementing aggressive plans to improve cash flow, reduce debt, and return leverage to our target levels as quickly as possible."

104.     Nevertheless, the Individual Defendants continued to mislead investors. In the June 8, 2022 Press Release, ScottsMiracle purported to warn investors about their inventory levels by claiming that "[i]f the Company underestimates or overestimates demand for its products and does not maintain appropriate inventory levels, [ScottsMiracle's] net sales and/or working capital could be negatively impacted" even though these risks had already materialized.

105.     On this news, the price of the Company's common stock dropped $9.05 per share, or approximately 9%, from a closing price of $102.18 per share on June 7, 2022, to a closing price of $93.13 per share on June 8, 2022.

106.     Nevertheless, the Individual Defendants continued to conceal the truth about ScottsMiracle's inventory saturation and debt covenant compliance problems.

107.     On August 3, 2022, ScottsMiracle issued a press release announcing its third quarter 2022 financial results for the period ending on July 2, 2022. Press Release, The Scotts Miracle-Gro Company, ScottsMiracle-Gro Announces Third Quarter Financial Results; Introduces Project Springboard to Enhance Shareholder Value (Aug. 3, 2022) (the "August 3, 2022 Press Release"). Therein, the Company reported an adjusted EBITDA for the quarter of $209.6

million, well below the $357.1 million adjusted EBITDA reported in the same quarter for its prior

fiscal year. The August 3, 2022 Press Release stated as follows:

> The Company's debt-to-EBITDA ratio at the end of the quarter was 5.1 times.
>
> "The recent amendment to our credit facility provides flexibility for leverage up to 6.5 times debt-to-EBITDA at our expected peak, but, clearly, we are taking aggressive steps to reduce leverage as quickly as possible," said Cory Miller, executive vice president and chief financial officer. "We are committed to getting leverage back to our target of 3.5 times debt-to-EBITDA within 24 months. We intend to provide more details around these efforts in early November when we announce year-end earnings and discuss our initial outlook for fiscal 2023."

108.    During the related earnings call, Defendant Miller assured investors that any

difficulty the Company was encountering in selling its products was primarily caused by "every

unit just costing more."

109.    On August 10, 2022, the Company filed its third quarter 2022 financial report on

Form 10-Q with the SEC for the third quarter ended July 2, 2022, signed by Defendant Miller and

containing SOX certifications signed by Defendants Miller and J. Hagedorn. The ScottsMiracle-

Gro Company, Quarterly Report (Form 10-Q) (August 10, 2022). ("Q3 2022 Form 10-Q").

110.    The Q3 2022 Form 10-Q stated that "the maximum permitted leverage ratio" were

as follows:

> (i) 6.25 for the third quarter of fiscal 2022 through the first quarter of fiscal 2023, (ii) 6.50 for the second and third quarters of fiscal 2023, (iii) 6.25 for the fourth quarter of fiscal 2023 and the first quarter of fiscal 2024, (iv) 5.50 for the second quarter of fiscal 2024, and (v) 4.50 for the third quarter of fiscal 2024 and thereafter. The Company's leverage ratio was 5.10 at July 2, 2022.

111.    On November 2, 2022, ScottsMiracle issued a press release announcing fourth

quarter and full year 2022 financial result for the period ending September 30, 2022. Press

Release, The Scotts Miracle-Gro Company, ScottsMiracle-Gro Announces Full-Year Sales and

Earnings in Line with Guidance; Launches Phase Two of Project Springboard to Realize Further

Cost Savings (Nov. 2, 2022) (the "November 2, 2022 Press Release"). In relevant part, the November 2, 2022 Press Release stated as follows:

> Beginning with the three months ended September 30, 2022, equity in income / loss of unconsolidated affiliates is excluded from the calculation of non-GAAP Adjusted EBITDA. This exclusion is consistent with the calculation of that measure as required by the Company's borrowing arrangements. This change has been reflected in the calculation of Adjusted EBITDA for the three and twelve months ended September 30, 2022. The prior period amounts have not been reclassified to conform to the revised calculation.

112. During the related earnings call, an analyst asked about the Company's EBITDA growth and how ScottsMiracle was going to sustain its leverage ratio compliance. Defendant Evans responded by stating as follows: "I can just tell you that the EBITDA growth that we have built in our plan is, today, I mean, we're not presenting a plan that says we're going to be in default." Rather, according to Evans, the Company was "presenting a plan that says we will be in compliance." On the same call, Defendant J. Hagedorn claimed that he was "optimistic we will remain within the bounds of our bank covenants."

113. On November 28, 2022, the Company filed its full-year 2022 financial report on Form 10-K with the SEC. The ScottsMiracle-Gro Company, Annual Report (Form 10-K) (November 28, 2022). ("2022 Form 10-K"). The 2022 Form 10-K was signed by Defendants Evans, Finn, Hanft, J. Hagedorn, Johnson, Kelly, Littlefield, Mistretta, Sandoval, Shumlin, Vines, and Volas. The 2022 Form 10-K also contained SOX certifications signed by Defendants Evans and J. Hagedorn. With respect to the Company's leverage ratio, the 2022 Form 10-K stated as follows:

> [U]nder our credit facility the maximum permitted leverage ratio is (i) 6.25 for the third quarter of fiscal 2022 through the first quarter of fiscal 2023, (ii) 6.50 for the second and third quarters of fiscal 2023, (iii) 6.25 for the fourth quarter of fiscal 2023 and the first quarter of fiscal 2024, (iv) 5.50 for the second quarter of fiscal 2024, and (v) 4.50 for the third quarter of fiscal 2024 and thereafter. Our leverage ratio was 6.01 at September 30, 2022.

114.    The 2022 Form 10-K also contained the following risk factor relating to inventory levels:

> ***If we underestimate or overestimate demand for our products and do not maintain appropriate inventory levels, our net sales and/or working capital could be negatively impacted.***
>
> Our ability to manage our inventory levels to meet our customers' demand for our products is important for our business.  Our production levels and inventory management goals for our products are based on estimates of demand, taking into account production capacity, timing of shipments, and inventory levels.  If we overestimate or underestimate either channel or retail demand for any of our products during a given season, we may not maintain appropriate inventory levels, which could negatively impact our net sales, profit margins, net earnings, working capital and/or cash flow, hinder our ability to meet customer demand, result in loss of customers, or cause us to incur excess and obsolete inventory charges or excess warehouse storage costs.
>
> For example, during fiscal 2022, a significant decrease in sales volume coupled with a recent expansion of our production and supply chain resulted in higher fixed costs and inventory levels.  These factors negatively impacted our net sales, profit margins, net earnings and operating cash flow.  [Emphasis added].

115.    On February 1, 2023, ScottsMiracle held an earnings call to discuss the Company's first quarter 2023 financial results for the period ended on December 31, 2022.  During the call, Defendant J. Hagedorn presented the Company's financial performance "against [ScottsMiracle's] internal targets" and stated that "[n]et sales that beat the plan by nearly $25 million; gross margin improvement of almost 300 basis points against our plan; EBITDA of $21 million against an internal forecast of zero; net leverage of 5.9 times debt-to-EBITDA comfortably within the covenant maximum of 6.25 times."  During the call, Defendant J. Hagedorn further stated that he did not "think we have a[n] inventory problem at all."  Defendant Garth also stated that ScottsMiracle had "record December shipments."

116.    On February 8, 2023, the Company filed its first quarter report on Form 10-Q with the SEC.  The ScottsMiracle-Gro Company, Quarterly Report (Form 10-Q) (Feb. 8, 2023). ("Q1 2023 Form 10-Q").  The Q1 2023 Form 10-Q was signed by Defendant Garth and contained SOX

certifications signed by Defendants Garth and J. Hagedorn. The Q1 2023 Form 10-Q stated the following:

> [T]he maximum permitted leverage ratio is (i) 6.25 for the third quarter of fiscal 2022 through the first quarter of fiscal 2023, (ii) 6.50 for the second and third quarters of fiscal 2023, (iii) 6.25 for the fourth quarter of fiscal 2023 and the first quarter of fiscal 2024, (iv) 5.50 for the second quarter of fiscal 2024, and (v) 4.50 for the third quarter of fiscal 2024 and thereafter. The Company's leverage ratio was 5.90 at December 31, 2022.

117. On March 6, 2023, Defendant Garth attended a Raymond James Institutional Investors Conference on behalf of the Company. During the conference, Defendant Garth represented to investors that the "[f]irst quarter proved that we were able to stay within our covenant 5.9 times against the 6.25 covenant." He continued by claiming that ScottsMiracle had experienced "record December shipments."

118. On May 3, 2023, ScottsMiracle issued a press release announcing its second quarter 2023 financial results for the period ending April 1, 2023. Press Release, The Scotts Miracle-Gro Company, ScottsMiracle-Gro Reports Fiscal 2023 Second Quarter Results, May 3, 2023 (the "May 3, 2023 Press Release"). Therein, the Company reported Adjusted EBITDA for the quarter of $404.8 million and that "the Company's average net debt-to-EBITDA ratio at the end of the quarter was 6.0 times versus the covenant maximum of 6.5 times."

119. During the related earnings call, Defendant Garth represented to investors that the "lower shipment volumes are related to our expectation for reduced retail inventory levels." He also claimed that "we've pulled back on production volumes and we are selling through higher cost inventory."

120. During the same call, Defendant J. Hagedorn stated that the Company "do[es] not see leverage compliance issues going forward as [it's] looking at the low-5 times range by fiscal

year end." He continued by touting that the "team on consumer has just really killed it," which was "really, really important for us to avoid covenant hell" in the first half of the year.

121. On May 10, 2023, the Company filed its second quarter report on Form 10-Q with the SEC, signed by Defendant Garth and containing SOX certifications by Defendants Garth and J. Hagedorn. The ScottsMiracle-Gro Company, Quarterly Report (Form 10-Q) (May 10, 2023). ("Q2 2023 Form 10-Q"). The Q2 2023 Form 10-Q stated the following:

> [T]he maximum permitted leverage ratio is (i) 6.50 for the second and third quarters of fiscal 2023, (ii) 6.25 for the fourth quarter of fiscal 2023 and the first quarter of fiscal 2024, (iii) 5.50 for the second quarter of fiscal 2024, and (iv) 4.50 for the third quarter of fiscal 2024 and thereafter. The Company's leverage ratio was 6.01 at April 1, 2023.

122. The above statements identified in ¶¶ 102-121 were materially false and misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects. To avoid breaching the Company's debt covenant requirements, the Individual Defendants caused ScottsMiracle to engage in a series of deceptive practices:

   a. They flooded the market with excess inventory, pressuring retailers to purchase more products than needed or wanted;

   b. They misrepresented the Company's inventory levels and sales performance, claiming strong demand and "record shipments" when in reality, ScottsMiracle was struggling with inventory saturation;

   c. They falsely assured investors that the Company was "comfortably within" its debt covenant requirements when, in fact, ScottsMiracle was dangerously close to breaching these covenants;

   d. They improperly changed how the Company calculated EBITDA in the fourth quarter of the 2022 fiscal year to remain compliant with debt covenants; and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

e. They failed to maintain adequate internal controls over financial reporting. As a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

## THE TRUTH IS REVEALED

123. On August 2, 2023, ScottsMiracle issued a press release announcing its third quarter 2023 financial results for the period ended July 1, 2023. Press Release, The Scotts Miracle-Gro Company, ScottsMiracle-Gro Announces Third Quarter Financial Results; Updates Full Year Sales and Earnings Outlook (Aug. 2, 2023) (the "August 2, 2023 Press Release"). In the August 2, 2023 Press Release, the Company disclosed that it had amended its debt covenants. The most significant amendment was that the Company had to modify its debt covenants to permit a 7.00 times debt-to-EBITDA ratio, from the original covenant that only permitted a 6.25 times debt-to-EBITDA ratio:

> GAAP and non-GAAP adjusted gross margin rates for the quarter were 18.4 percent and 21.3 percent, respectively. These compare to 19.9 percent and 25.5 percent in the prior year. The declines were primarily due to higher commodity costs and unfavorable conversion and fixed cost leverage related to lower volume in both major business segments. Gross margin rates were also nearly 200 basis points lower from one-time pandemic-driven excess and obsolete inventory write-offs. These combined pressures were partially offset by net pricing and distribution savings from Project Springboard. Favorability from net pricing was significantly lower for the quarter, ending near flat to prior year, on lower Lawns category volume and higher costs related to volume rebates and promotional programs. The Company's debt-to-EBITDA ratio at the end of the quarter was 6.15 times and within the revised covenant maximum of 7.00 times.

124. During the related earnings call, ScottsMiracle revealed that quarterly sales for its third quarter of 2023 had declined by 6%, and gross margins fell by 420 basis points. The Company also slashed fiscal year EBITDA guidance by 25% and announced it had to take a $20 million write down for "pandemic driven excess inventories."

125.    On this news, the Company's stock price dropped $13.58 per share, or 19%, from a closing price of $71.44 per share on August 1, 2023, to a closing price of $57.86 per share on August 2, 2023.

## INVESTORS FILE SECURITIES CLASS ACTIONS

126.    On June 6, 2024, a purported purchaser of Company stock filed a securities class action complaint, captioned *City of Hialeah Employees' Ret. Sys. v. The Scotts Miracle-Gro Company, et al.*, Case 2:24-cv-03132-AM-CMV in the Southern District of Ohio against ScottsMiracle and Defendants Evans, Garth, J. Hagedorn, C. Hagedorn, and Miller (the "Hialeah Complaint"). The Hialeah Complaint alleges that throughout the class period of November 3, 2021 to August 1, 2023, Defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects.

127.    On July 26, 2024, a purported purchaser of Company stock filed a securities class action complaint, captioned *City of Inkster Policemen and Firemen Ret. Sys. v. The Scotts Miracle-Gro Company, et al.*, Case 2:24-cv-03766-EAS-CMV in the Southern District of Ohio against ScottsMiracle and Defendants Evans, Garth, J. Hagedorn, C. Hagedorn, and Miller (the "Inkster Complaint," and together with the Hialeah Action, the "Securities Class Action"). The Inkster Complaint alleges that throughout the class period of June 2, 2021 to August 1, 2023 Defendants made materially false and/or misleading statements, failing to disclose material adverse facts about the Company's business, operations, and prospects.

## SCOTTSMIRACLE REPURCHASES SHARES DURING THE RELEVANT PERIOD

128.    During the Relevant Period, the Individual Defendants caused the Company to repurchase its common stock at artificially inflated prices. In total, during the Relevant Period, the Company spent approximately $225 million to repurchase over 1.4 million shares at artificially inflated prices. The actual value of the Company's stock was $57.86 per share as of closing on

August 2, 2023; therefore, ScottsMiracle should have spent approximately $84 million to repurchase its stock during the Relevant Period. As a result of the overpayment, ScottsMiracle suffered damages in the amount of approximately $141 million.

129. The following chart details the Company's repurchase transactions during the Relevant Period:

| Repurchase Period | Number of Shares | Repurchase Price Per Share | Repurchase Amount | Actual Value of Repurchased Shares ($57.86) | Overpayment |
|---|---|---|---|---|---|
| 5/30/21 - 7/3/21 | 47,165 | $ 195.73 | $ 9,231,605.45 | $ 2,728,966.90 | $ 6,502,638.55 |
| 7/4/21 - 7/31/21 | 629 | $ 182.45 | $ 114,761.05 | $ 36,393.94 | $ 78,367.11 |
| 8/1/21 - 8/28/21 | 127,579 | $ 157.64 | $ 20,111,553.56 | $ 7,381,720.94 | $ 12,729,832.62 |
| 8/29/21 - 9/30/21 | 112,218 | $ 158.02 | $ 17,732,688.36 | $ 6,492,933.48 | $ 11,239,754.88 |
| 10/1/21 - 10/30/21 | 115,489 | $ 148.22 | $ 17,117,779.58 | $ 6,682,193.54 | $ 10,435,586.04 |
| 10/31/21 - 11/27/21 | 521,406 | $ 168.53 | $ 87,872,553.18 | $ 30,168,551.16 | $ 57,704,002.02 |
| 11/28/21 - 1/1/22 | 134,685 | $ 152.64 | $ 20,558,318.40 | $ 7,792,874.10 | $ 12,765,444.30 |
| 1/2/22 - 1/29/22 | 97,009 | $ 157.71 | $ 15,299,289.39 | $ 5,612,940.74 | $ 9,686,348.65 |
| 1/30/22 - 2/26/22 | 109,671 | $ 138.62 | $ 15,202,594.02 | $ 6,345,564.06 | $ 8,857,029.96 |
| 2/27/22 - 4/2/22 | 159,710 | $ 126.34 | $ 20,177,761.40 | $ 9,240,820.60 | $ 10,936,940.80 |
| 4/3/22 - 4/30/22 | 946 | $ 104.04 | $ 98,421.84 | $ 54,735.56 | $ 43,686.28 |
| 5/1/22 - 5/28/22 | 1,087 | $ 96.05 | $ 104,406.35 | $ 62,893.82 | $ 41,512.53 |
| 5/29/22 - 7/2/22 | 2,569 | $ 87.99 | $ 226,046.31 | $ 148,642.34 | $ 77,403.97 |
| 7/3/22 - 7/30/22 | 1,255 | $ 82.53 | $ 103,575.15 | $ 72,614.30 | $ 30,960.85 |
| 7/31/22 - 8/27/22 | 1,389 | $ 72.93 | $ 101,299.77 | $ 80,367.54 | $ 20,932.23 |
| 8/28/22 - 9/30/22 | 2,308 | $ 58.33 | $ 134,625.64 | $ 133,540.88 | $ 1,084.76 |
| 10/1/22 - 10/29/22 | 2,166 | $ 47.75 | $ 103,426.50 | $ 125,324.76 | $ (21,898.26) |
| 11/27/22 - 12/31/22 | 2,822 | $ 52.53 | $ 148,239.66 | $ 163,280.92 | $ (15,041.26) |
| 1/1/23 - 1/28/23 | 109 | $ 63.19 | $ 6,887.71 | $ 6,306.74 | $ 580.97 |
| 2/26/23 - 4/1/23 | 2,640 | $ 72.52 | $ 191,452.80 | $ 152,750.40 | $ 38,702.40 |
| 4/2/23 - 4/29/23 | 105 | $ 65.68 | $ 6,896.40 | $ 6,075.30 | $ 821.10 |
| 4/30/23 - 5/27/23 | 2,648 | $ 65.53 | $ 173,523.44 | $ 153,213.28 | $ 20,310.16 |
| 5/28/23 - 7/1/23 | 3,634 | $ 60.23 | $ 218,875.82 | $ 210,263.24 | $ 8,612.58 |
| 7/2/23 - 7/29/23 | 1,291 | $ 69.87 | $ 90,202.17 | $ 74,697.26 | $ 15,504.91 |
| 7/30/23 - 8/26/23 | 1,743 | $ 53.07 | $ 92,501.01 | $ 100,849.98 | $ (8,348.97) |
| **Total** | **1,452,273** | | **$225,219,284.96** | **$ 84,028,515.78** | **$141,190,769.18** |

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT
## DIRECTLY AND PROXIMATELY CAUSES DAMAGES TO SCOTTSMIRACLE

130. As a result of the Individual Defendants' improprieties, ScottsMiracle disseminated improper public statements concerning ScottsMiracle's operations, prospects, and internal controls. This misconduct has devastated ScottsMiracle's credibility.

131. As a direct and proximate result of the Individual Defendants' actions, ScottsMiracle has expended, and will continue to expend, significant sums of money defending and paying any settlement in the Securities Class Action.

132. As a direct and proximate result of the Individual Defendants' actions as alleged above, ScottsMiracle's market capitalization has been substantially damaged, losing millions of dollars in value because of the conduct described herein.

133. Lastly, the actions of the Individual Defendants have irreparably damaged ScottsMiracle's corporate image and goodwill. For at least the foreseeable future, ScottsMiracle will suffer from what is known as the "liar's discount," a term applied to the stocks of companies that have been implicated in illegal behavior and have misled the investing public, such that ScottsMiracle's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

134. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

135.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

136.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws.  In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were direct, necessary, and substantial participants in the common enterprise, and/or common course of conduct complained of herein because the action described herein occurred under the authority and approval of the Board.

137.     Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

138.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and ScottsMiracle and was at all times acting within the course and scope of such agency.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**PLAINTIFF HAS BEEN A STOCKHOLDER SINCE THE
ALLEGED WRONGDOING AND WILL FAIRLY AND ADEQUATELY
REPRESENT THE COMPANY'S AND ITS STOCKHOLDERS' INTERESTS**

139.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

140.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' misconduct.

141.     Plaintiff is an owner of ScottsMiracle common stock and has been an owner of ScottsMiracle common stock since the wrongdoing alleged herein.

142.     Plaintiff has hired counsel experienced in conducting derivative litigation and will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting the Company's rights.

**DEMAND IS FUTILE**

**A.      Demand Is Futile Because Each Member of the
Board Faces a Substantial Likelihood of Personal Liability**

143.     At the time Plaintiff commenced this action, the Board consisted of eleven directors, including Director Defendants: Avilés, Evans, J. Hagedorn, Hanft, Johnson, Kelly, Littlefield, Sandoval, Shumlin, and Vines and Relevant Non-Party and Kingdon.  The Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

144.     The Director Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements and, as such, had a fiduciary duty to ensure the accuracy of the Company's SEC filings, press releases, and other public statements and presentations concerning ScottsMiracle's business, operations, prospects, internal controls, and financial statements.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

145.    Moreover, the Director Defendants owed and owe a duty, in good faith and with due diligence, to exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and consciously reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

146.    Defendants Evans, Finn, Hagedorn, Hanft, Johnson, Kelly, Littlefield, Mistretta, Shumlin, Vines, and Volas approved the 2021 Proxy Statement and, therefore, face a substantial likelihood of personal liability because of the false and misleading statements contained therein.

147.    Defendants Evans, Finn, J. Hagedorn, Hanft, Johnson, Kelly, Littlefield, Mistretta, Sandoval, Shumlin, Vines, and Volas approved the 2022 Proxy Statement and, therefore, face a substantial likelihood of personal liability because of the false and misleading statements contained therein.

148.    The Director Defendants face a substantial likelihood of personal liability because of their conscious and knowing authorization of false and misleading statements, their failure to timely correct such statements, their failure to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective and were being implemented effectively, and their failure to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.

149.    If the Director Defendants were to bring a suit on behalf of ScottsMiracle to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  For this reason, Plaintiff's making a demand would be futile.

**B.      As Members of the Audit Committee, the Audit Committee Defendants Face a Greater Likelihood of Personal Liability**

150.    The Audit Committee Defendants (Avilés, Evans, and Kelly), as members of the Audit Committee during the Relevant Period, participated in and knowingly approved the filing of false financial statements.  More specifically, as members of the Audit Committee, the Audit Committee Defendants were obligated to review the Company's annual and quarterly reports to ensure their accuracy.  Instead, they failed to ensure the integrity of the Company's financial statements and financial reporting process and its systems of internal accounting and financial controls and other financial information provided by the Company, as required by the Audit Committee Charter.  For this reason, the Audit Committee Defendants cannot exercise disinterested business judgment in considering a demand.

**C.      The Finance Committee Defendants as Members of the Finance Committee Face a Greater Likelihood of Personal Liability**

151.    The Finance Committee Defendants (Avilés, Evans, Hanft, Kelly, and Littlefield) as members of the Finance Committee during the Relevant Period were required to review and make recommendations to the Board regarding the Company's corporate financial matters, including those matters relating to ScottsMiracle's credit facility, financial structure, credit capacity, and covenant forecasts.  Moreover, the Finance Committee Defendants were also required to review and make recommendations to the Board regarding ScottsMiracle's capital expenditures, operating budget, and review its financial authority limits.  However, in breach of their fiduciary duties, the Finance Committee Defendants violated the Finance Charter by participating in the scheme to conceal ScottsMiracle's precarious debt situation by flooding the

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

market with excess inventory and, thus, misrepresenting its inventory levels. Additionally, the Finance Committee Defendants assisted in falsely assuring investors that the Company was "comfortably within" its debt covenant requirements when, in fact, ScottsMiracle was close, and did, to breaching these covenants. For this reason, the Finance Committee Defendants cannot exercise disinterested business judgment in considering a demand

### D. The Insider Trading Defendants on the Board Face a Greater Likelihood of Personal Liability

152. Because of their positions as officers and/or board members, each of the Insider Trading Defendants (Defendants Evans, J. Hagedorn, Johnson, and Shumlin) possessed material non-public information regarding (i) that the Company was flooding the market with excess inventory, pressuring retailers to purchase more products than needed or wanted; (ii) thus, ScottsMiracle did not have a strong demand for its product and was struggling with inventory saturation; (iii) that the Company was close to breaching its loan covenant requirements; (iv) thus, they improperly changed how the Company calculated EBITDA in the fourth quarter of the 2022 fiscal year to remain compliant with debt covenants; (v) they failed to maintain adequate internal controls over financial reporting; and vi) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

153. The Insider Trading Defendants unlawfully misused this information and unjustly enriched themselves by selling their shares at artificially inflated prices. As a result, the Insider Trading Defendants' conduct harmed ScottsMiracle as the Insider Trading Defendants unjustly enriched themselves at the Company's expense. Accordingly, because this action asserts claims for unjust enrichment against the Insider Trading Defendants, and because the Insider Trading Defendants face a substantial likelihood of liability for these claims as well as for their breaches

of fiduciary duty to the Company, the Insider Trading Defendants are incapable of considering a demand to commence and vigorously prosecute this action.

### E. The Securities Class Action Defendants on the Board Face an Even Greater Likelihood of Personal Liability than Other Director Defendants

154.    Defendants  Evans and J. Hagedorn are incapable of considering a demand to commence and vigorously prosecute this action because they each face an additional substantial likelihood of liability.

155.    Defendants Evans and J. Hagedorn are named defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act as well as SEC Rule 10b-5 promulgated under the Exchange Act.  If the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Evans and J. Hagedorn's willful and/or reckless violations of their obligations as officers and directors of ScottsMiracle.  Hence, Defendants Evans and J. Hagedorn are incapable of considering a demand to commence and vigorously prosecute this action because they each face an even greater likelihood of personal liability than the rest of the Defendants.

### F. Defendants J. Hagedorn, Littlefield, and Hanft Lack Independence

156.    According to the Proxy Statements, the Board determined that: (a) Defendant J. Hagedorn is not independent because he is the Company's CEO; (b) Defendant Littlefield is not independent because she is the sister of Defendant J. Hagedorn; and (c) Defendant Hanft is not independent because he has received consulting compensation from the Company within the last three years that exceeds the applicable threshold for determining whether a director can be considered independent.  Moreover, Defendant Littlefield is the general partner and former Chair of the Hagedorn Partnership, L.P., the Company's largest shareholder.

157.     Accordingly, Defendant J. Hagedorn, Littlefield, and Hanft could not exercise independent judgment in considering a demand to investigate and prosecute the claims asserted in this action because it would require him to sue the Company and the members of the Board.

**FIRST CLAIM FOR RELIEF**
**Against the Individual Defendants for Breach of Fiduciary Duties**

158.     Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

159.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of ScottsMiracle's business and affairs.

160.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

161.     The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of ScottsMiracle.

162.     In breach of their fiduciary duties owed and owe to ScottsMiracle, the Individual Defendants willfully or recklessly made, or caused or permitted the Company to make, false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, (i) that the Company was flooding the market with excess inventory, pressuring retailers to purchase more products than needed or wanted; (ii) thus, ScottsMiracle did not have a strong demand for its product and was struggling with inventory saturation; (iii) that the Company was close to breaching its loan covenant requirements; (iv) thus, they improperly changed how the Company calculated EBITDA in the fourth quarter of the 2022 fiscal year to remain compliant with debt covenants; (v) they failed to maintain adequate internal controls over financial reporting; and (vi)

as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis.

163.     Accordingly, ScottsMiracle's public statements were materially false, misleading, and lacked a reasonable basis during the Relevant Period, thereby, causing the stock to trade at artificially inflated prices.

164.     The Individual Defendants failed to and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, thereby rendering themselves personally liable to the Company for breaching their fiduciary duties.

165.     The Individual Defendants also failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls in breach of their fiduciary duties.

166.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements.  The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard to the truth in that they failed to ascertain and disclose such facts even though such facts were available to them.  Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities.

167.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls.  The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained or acted with reckless disregard for the truth in that they caused the

Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

168. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

169. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ScottsMiracle has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

**SECOND CLAIM FOR RELIEF**
**Against the Securities Class Action Defendants for**
**<u>Violations of Sections 10(b) of the Exchange Act and Rule 10b-5</u>**

170. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

171. The Individual Defendants are liable to the Company because they violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by the SEC.

172. The Individual Defendants did the following while acting individually and collectively:

    a.    employed devises, schemes, and artifices to defraud;

    b.    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

      c.      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon the Company in connection with its purchases of ScottsMiracle common stock during the Relevant Period.

173.    As set forth above, the Individual Defendants disseminated or approved the dissemination of material false and misleading statements while also failing to disclose material facts necessary to make the statements made not misleading under the circumstances.

174.    The Individual Defendants knew or recklessly disregarded facts showing that these statements were false and misleading because they received or had access to such information.

175.    As a result of the Individual Defendants' making these materially false and misleading statements or permitting them to be made, ScottsMiracle's common stock traded at artificially inflated prices during the Relevant Period.

176.    As discussed above, the Company spent over $225 million purchasing over 1.4 million shares of ScottsMiracle common stock at artificially inflated prices during the Relevant Period when it should have spent around $84 million for that number of shares.

177.    Accordingly, the Company has suffered damages because it paid artificially inflated prices for ScottsMiracle common stock.

**THIRD CLAIM FOR RELIEF**
**Against the Securities Class Action Defendants**
**for Contribution under Sections 10(b) and 21D of the Exchange Act and SEC Rule 10b-5**

178.    Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

179.    ScottsMiracle along with the Securities Class Action Defendants (Evans, Garth, C. Hagedorn, J. Hagedorn, and Miller) are named as defendants in at least one of the Securities Class Actions, which asserts claims under the federal securities laws for violations of Sections 10(b) and 21D of the Exchange Act and SEC Rule 10b-5.  If the Company is found liable in the Securities

Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Securities Class Action Defendants' willful and/or reckless violations of their obligations as officers and/or directors of ScottsMiracle.

180. Because of their positions of control and authority as officers and/or directors of ScottsMiracle, the Securities Class Action Defendants were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of ScottsMiracle, including the wrongful acts complained of herein and in the Securities Class Action.

181. Accordingly, the Securities Class Action Defendants are liable under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, which create an implied private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

182. As such, ScottsMiracle is entitled to receive all appropriate contribution or indemnification from the Securities Class Action Defendants.

**FOURTH CLAIM FOR RELIEF**
**Against the Individual Defendants for**
**Violations of § 14(a) of the Exchange Act and SEC Rule 14a-9**

183. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

184. Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

185. The Proxy Statements violated Section 14(a) and Rule 14a-9 because they solicited ScottsMiracle stockholder votes for, inter alia, director reelection, while simultaneously misrepresenting and/or failing to disclose the Company's actual business, operations, and prospects.

186. The Individual Defendants made untrue statements of material facts and omitted to state material facts necessary to make the statements that were made not misleading in violation of Section 14(a) and Rule 14a-9. By virtue of their positions within the Company and roles in the process and in the preparation of the Proxy Statements, the Individual Defendants were aware of this information and of their duty to disclose this information in the Proxy Statements.

187. The Individual Defendants knew that the statements contained in the Proxy Statements were materially false and misleading.

188. The omissions and false and misleading statements in the Proxy Statements are material in that a reasonable stockholder would consider them important in deciding how to vote on the re-election of directors. Indeed, a reasonable investor would view a full and accurate disclosure as significantly altering the "total mix" of information made available in the Proxy Statements and in other information reasonably available to stockholders.

189. As a direct and proximate result of the dissemination of the false and misleading Proxy Statements that the Individual Defendants used to obtain stockholder approval of and thereby re-elect directors, nominal defendant ScottsMiracle suffered damage and actual economic losses (i.e., wrongful re-election of directors) in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### Against the Individual Defendants for Unjust Enrichment

190. Plaintiff incorporates by reference and realleges each and every allegation set forth above as though fully set forth herein.

191.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, ScottsMiracle.

192.    The Individual Defendants benefitted financially from the improper conduct, received unjustly lucrative bonuses tied to the false and misleading statements, and received bonuses, stock options, or similar compensation from ScottsMiracle that was tied to the performance or artificially inflated valuation of ScottsMiracle, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

193.    Plaintiff, as a stockholder and representative of ScottsMiracle, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants from their wrongful conduct and breach of their fiduciary duties.

194.    Plaintiff, on behalf of ScottsMiracle, has no adequate remedy at law.

## SIXTH CLAIM FOR RELIEF
### Against all the Individual Defendants for Aiding and Abetting

195.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.    Each of the Individual Defendants acted and is acting with knowledge of, or with disregard to, the fact that the Defendants are in breach of their fiduciary duties to ScottsMiracle and has participated in a conspiracy in breach of fiduciary duties.

197.    In committing the wrongful acts alleged herein, each of the Individual Defendants has pursued, or joined in the pursuit of, a common course of conduct.  The Individual Defendants have acted in concert with and conspired with one another in furtherance of their common plan or

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

design. In addition to pursuing the wrongful conduct that gives rise to their primary liability, the Individual Defendants also aided, abetted, and assisted each other in breaching their respective duties.

198. The Individual Defendants collectively and individually initiated and followed a course of conduct that violated the federal securities laws; authorized corporate actions to serve their own personal interests rather than the interests of the Company and its stockholders; misrepresented material facts about the Company, its financial condition, and business prospects; prevented the disclosure of material information necessary to make statements complete and accurate; and failed to implement and maintain an adequate system of internal controls and corporate governance practices.

199. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and common course of conduct was, among other things, to disguise the Defendants' violations of law, including violations of the federal securities laws and breaches of fiduciary duty.

200. Each of the Individual Defendants played a direct, necessary, and substantial part in the conspiracy, common enterprise, and common course of conduct complained of herein.

201. Each of the Individual Defendants aided, abetted, and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, the Individual Defendants acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and were aware of their overall contributions to and furtherance of the wrongdoing.

**SEVENTH CLAIM FOR RELIEF**
**Against the Insider Trading Defendants for**
**<u>Insider Selling and Misappropriation of Information</u>**

202. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

203.    At the time of their stock sales set forth herein, the Insider Trading Defendants (Evans, C. Hagedorn, J. Hagedorn, Johnson, Miller, and Shumlin) knew of the information described above and sold ScottsMiracle common stock on the basis of such information.

204.    The information described above was proprietary non-public information concerning the Company.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants used for their own benefit when they sold ScottsMiracle common stock.

205.    The Insider Trading Defendants' sales of Company common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

206.    Because the use of the Company's proprietary information for their own gain constitutes a breach of Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits that the Insider Trading Defendants obtained thereby.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of ScottsMiracle and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.    Ordering the Insider Trading Defendants to disgorge monies obtained as a result of their sale of ScottsMiracle stock while in possession of insider information as described herein;

D.    Awarding prejudgment interest to the Company;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

E.    Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated:  November 22, 2024                    Respectfully submitted,

                                             GIBBS LAW GROUP LLP

                                             */s/ Shawn K. Judge*
                                             Shawn K. Judge (0069493), Trial Attorney
                                             Mark H. Troutman (0076390)
                                             1554 Polaris Parkway, Suite 325
                                             Columbus, Ohio 43240
                                             Tel: (614) 908-4081
                                             Fax: (510) 350-9701
                                             Email: skj@classlawgroup.com
                                                     mht@classlawgroup.com

                                             BRAGAR EAGEL & SQUIRE, P.C.
                                             (*pro hac vice motion to be submitted*)

                                             Lawrence P. Eagel
                                             Gabriela A. Cardé
                                             810 Seventh Avenue, Suite 620
                                             New York, New York 10019
                                             Tel:  212-308-5858
                                             Fax: 212-486-0462
                                             Email: eagel@bespc.com
                                                     carde@bespc.com

                                             Badge Humphries
                                             2113 Middle Street, Suite 305
                                             Sullivan's Island, South Carolina 29482
                                             Tel:  843-883-7444
                                             Email: humphries@bespc.com

                                             *Attorneys for Plaintiff, Jeff Hurst, derivatively on behalf of The Scotts Miracle-Gro Company*

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, Jeff Hurst, declare that I have reviewed the Verified Stockholder Derivative Complaint ("Complaint") prepared on behalf of The Scotts Miracle-Gro Company., and authorize its filing. I have reviewed the allegations made in the Complaint, and as to those allegations of which I have personal knowledge, I believe those allegations to be true.  As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and, for that reason, believe them to be true.  I further declare that I am a current holder of The Scotts Miracle-Gro Company. stock and have continuously held The Scotts Miracle-Gro Company. stock from the time of the wrongdoing alleged herein until the present.  I declare under penalty of perjury that the foregoing is true and correct.

Executed this _21_ day of November 2024.

*Jeff Hurst*

Jeff Hurst (Nov 22, 2024 01:25 EST)

Jeff Hurst